FILED & JUDGMENT ENTERED
David E. Weich

Jun 17 2009

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 08-31710 |
| **222 SOUTH CALDWELL STREET,** | ) | Chapter 7 |
| **LIMITED PARTNERSHIP f/d/b/a,** | ) | |
| **THE PARK CONDOMINIUMS,** | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | | |
| **LANGDON M. COOPER, Trustee in** | ) | Adversary Pro. No. |
| **Bankruptcy for 222 South Caldwell** | ) | 08-3151 |
| **Street Limited Partnership** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BB Syndication Services, Inc.,** | ) | |
| **et al.** | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

**THIS MATTER** was before this Court on February 27, 2009

for hearing upon:

1) The Motion to Dismiss filed by the Sheth

Defendants, as joined by the Bertolami Defendants; and

2)    The Response thereto by BB Syndication Services, Inc. ("BB Syndication");

3)    The Motion for Judgment on the Pleadings filed by BB Syndication; and

4)    The responses and objections filed thereto by:

    a)    McClure Nicolson Montgomery Architects, PA ("McClure");

    b)    Cline Resources Development Co. ("Cline");

    c)    Rita Rochelle Miles & Miles Interior Design, Inc ("Miles");

    d)    The deposit purchaser Defendants represented by Katten Muchin Rosenman LLP ("Bertolami Defendants");

    e)    The deposit purchaser Defendants represented by Shuford Hunter, PLLC ("Sheth Defendants"); and

    f)    Langdon M. Cooper, Chapter 7 Trustee ("Trustee").

## I.    INTRODUCTION & PRIOR PROCEEDINGS.

222 South Caldwell Street Limited Partnership ("Debtor") is a single purpose entity, which was formed to construct, develop and sell units in a twenty-two (22) story residential condominium tower (the "Project") located at 222 South Caldwell Street, Charlotte, North Carolina.

Construction of the Project stopped in January 2008 with the construction less than seventy percent (70%) complete.

The Debtor is indebted to BB Syndication for construction lending in the approximate amount $28,721,634.31 (as of October 27, 2008). BB Syndication's loan is secured by a deed of trust ("Deed of Trust") on the Project. In February 2009, with the note both matured and in default, BB Syndication made demand on the Debtor. A foreclosure followed. The Project was sold at foreclosure on August 7, 2008. BB Syndication bid in, but only to the extent of $17,900,000. Summit Shores LLC ("Summit") upset BB Syndication's bid at $18,795,000. Four (4) days before the upset bid period was to expire, three creditors of the Debtor filed an involuntary bankruptcy petition with this Court on August 14, 2008.

On August 28, 2008, Langdon M. Cooper was appointed Trustee for the Debtor, supplanting the state court receiver. The Debtor did not contest the petition and an Order for Relief was entered on October 6, 2008.

The Trustee then reached an agreement with Summit to purchase the Project For $19,000,000 at a §363 sale free and clear of liens, subject to higher and better offers and Court approval. A sale at that price would not pay BB Syndication in full, much less the numerous other parties

owed money by the Debtor. BB Syndication generally supported the Trustee's "short" sale; however, objections were filed by numerous other parties, who for one reason or another asserted in rem interests in the Project and whose claims would not be paid under the proposed sale. A hearing on the motion was set for October 28, 2008. Summit posted a $1,000,000 earnest money deposit ("Deposit") with the Trustee towards its purchase.

Also on the docket was BB Syndication's Motion for Relief from Stay. With its partially constructed collateral exposed to the weather and deteriorating[1]; under secured by a significant amount ($29+ million debt versus a $19 million bid value) on its debt; and with the Trustee lacking any funds or other assets, BB Syndication was clearly not receiving adequate protection. Thus, the hearings promised that either a sale would be approved or the Project would return to foreclosure.

The sale hearings began with Summit attempting to withdraw its offer. The prospective additional bidders that all parties hoped for never appeared, so the hearings might have ended there with BB Syndication receiving relief from

---

[1] The Project at this point lacks both its permanent roof and its exterior siding.

stay to foreclose. However, all concerned believed this to be the worst possible outcome.

After a week of negotiations between the parties, on November 4, 2008, the buyer's issues were resolved and an agreement was reached. The sale of the Project, free and clear of liens and interests, to Summit was approved. (Order Authorizing and Confirming Private Sale of Property and Transferring Liens to Proceeds, Nov. 4, 2008, Case No. 08-31710)("Sale Order").

The Sale Order envisioned a bifurcated process: (1) a sale of the Project free and clear of liens and interests to Summit, (2) accompanied by a follow up adversary proceeding to determine entitlement to the net sale proceeds.

To protect BB Syndication, the lender was granted relief from stay to re-notice its foreclosure sale, and if the Summit sale did not close within forty-five (45) days, to foreclose. (Order Referencing Motion for Relief from Stay, Nov. 4, 2008, Case No. 08-31710)("Stay Order").

The agreed procedure offered benefits to all: the sale would generate a pot of money against which the parties could assert their in rem claims; the bankruptcy estate, by a $500,000 carve out would obtain funding to investigate whether any of the Debtor's monies had been improperly

disposed of before bankruptcy; the buyer would receive clear title to the property and the opportunity to negotiate new arrangements with the Purchasers.

To that end, on November 18, 2008, the Trustee filed this adversary proceeding. His Complaint seeks a determination of the validity, extent and priority of certain alleged liens and/or other interests in the Project and the proceeds. The Trustee's Complaint also seeks to determine the distribution of the net proceeds from the proposed 11 U.S.C. §363 sale of the Project.

The Defendants encompass all known persons who might claim an in rem interest in the Project, whether by lien, mortgage, or equitable claim arising from purchase deposits made towards the Project.

## II. The Parties

### A. BB Syndication

BB Syndication's interest in the Project arises from the Deed of Trust, which secured an extension of credit to the Debtor in the amount of $30,695,000 and was recorded in the Mecklenburg County Registry on February 21, 2006 at Book 20038, Page 91.

### B. Purchasers

In or around June 2004, the Debtor began entering into pre-construction contracts with the condominium unit

purchasers (the "Purchaser(s)") for the purchase of condominium units (collectively, the "Purchase Contracts").

Pursuant to the Purchase Contracts, each Purchaser agreed to pay a five percent (5%) initial deposit towards the purchase of one or more units and an undivided interest in the common areas of the condominium and a second five percent (5%) deposit at the commencement of construction of the condominium. Paragraph 3(a) of the Purchase Contracts provides:

> Earnest Money. Five percent (5%) of the Purchase Price . . . shall be paid as initial earnest money upon the signing of this Agreement. The initial earnest money shall be paid to and immediately deposited by Seller in a trust or escrow account in an insured bank or savings and loan association in North Carolina until the expiration of the Cancellation Period defined in Paragraph 12 herein. Upon expiration of the Cancellation Period, all earnest money shall remain in escrow account in an insured bank or savings and loan association until the start of construction of the Condominium. Upon the start of construction of the Condominium and within one week of notice from the Seller of the start of construction, Buyer shall deposit another 5% of the purchase price with seller as additional earnest money. The initial earnest money and additional earnest money stall total 10% (ten percent) of the purchase price . . . and collectively referred to herein as the "Earnest Money." After the start of construction of the Condominium and the expiration of the Cancellation Period, Seller shall be entitled to use the Earnest Money for any purpose whatsoever without obligation to segregate the same, and without obligation to return any interest thereon unless Seller defaults hereunder. At Closing, the Earnest Money will be credited to the amount

of the Purchase Price due at Closing, unless this
Agreement is otherwise terminated and the Earnest
Money is disbursed in accordance with the terms
hereof.  The Earnest Money may be increased for
Pre-Approved Upgrades as set forth in Paragraph
4.B. herein. *See* (Purchase Contracts, ¶ 3(a).)[2]

All of the responding Purchasers explicitly (or
implicitly) admit they did not record their respective
Purchase Contracts and certainly not prior to February
21, 2006, the date the Deed of Trust was recorded.[3]

The Purchasers[4] including, the Bertolami
Defendants and the Sheth Defendants, assert a number

---

[2] Pursuant to the Sale Order, each Purchaser who paid a deposit was
required to attach their Purchase Contract to their respective
responses to the Complaint.

[3] All of the responding condominium unit buyers, except one, admits or
fails to deny that their respective Purchase Contracts were not
recorded prior to February 21, 2006. Only Timothy Keene denies that
allegation for a "lack of knowledge or information." *See* (Keene Answer,
¶ 402.) However, a denial on that basis is, at minimum, a tacit
admission that he did not record his Purchase Contract.

[4] Certain Purchasers claim equitable liens (Defendants Bew, Antoniak,
Cline Resource and Development Company, Motameni, Cruz, Schmidt,
Willett, Macke, Keene, P. Miller, R Miller, Shiplett, Paratore,
Gochnauer, Neely, Ferrin, Kaplan, Murtaugh, Quill, Djuranovic, Varner,
Ness, Bertolami, Edwards, Rumbley, Sandra H. Dickinson, Ricci, Bibb,
Stebbins, Smith, Goldstein, Sheth, Webster, Muller, Fogt, Danner,
Mills, Piraino, Owens, Whitehead, Royster, Davis, and JPT Properties,
LLC). Within this group of Purchasers, certain parties have alleged
additional equitable defenses, including unjust enrichment (Antoniak);
constructive trust (Keene, R.Miller, P. Miller, R. Shiplett, K.
Shiplett, Paratore, Gochnauer, Neely, Ferrin, H. Kaplan, W. Kaplan, S.
Murtaugh, J. Murtaugh, B. Murtaugh, Quill, M. Djuranovic, G.
Djuranovic, Varner, Howie, D. Ness, L. Ness, Bertolami, Edwards, K.
Rumbley, V. Rumbley, Dickinson, T. Ricci, M. Ricci, B. Bibb, J.
Stebbins, K. Stebbins, Smith, Goldstein, Sheth, K. Webster, T. Webster,
Muller, Fogt, C. Danner, M. Danner, Mills, Giusto Piraino, Ginny
Piraino, J. Owens, Whitehead, Royster, R. Davis, JPT Properties, LLC);
and equitable estoppel (Keene, R.Miller, P. Miller, R. Shiplett, K.
Shiplett, Paratore, Gochnauer, Neely, Ferrin, H. Kaplan, W. Kaplan, S.
Murtaugh, J. Murtaugh, B. Murtaugh, Quill, M. Djuranovic, G.
Djuranovic, Varner, Howie, D. Ness, L. Ness, Bertolami, Edwards, K.

of theories based on the deposit payments made
pursuant to their Purchase Contracts with the Debtor.

### C. Defendant Miles

Defendant Miles is an interior designer who alleges
she provided certain design consulting services related to
the Project, including: "effecting" and "altering" the
design of the condominium when the Depositors requested
that she move walls or create bathrooms, closets or rooms
where none existed in the original architectural plans;
creating room renderings for submission to the architect;
selecting cladding, fixtures and signage; designing certain
common areas; and furnishing material samples for the
design sales center. Defendant Miles does not allege that
she is a registered architect, engineer, land surveyor or
landscape architect under North Carolina law.

### D. Subcontractors

The Subcontractors who have responded to the Complaint
and the respective dates on which they first provided
services include: C.P. Buckner Steel Erection, Inc. on July

---

Rumbley, V. Rumbley, Dickinson, T.Ricci, M. Ricci, B. Bibb, J.
Stebbins, K. Stebbins, Smith, and Goldstein).

Other Purchasers who paid deposits responded to the Complaint but (1)
failed to respond to the allegations of the Complaint and/or asserted
no claim for relief (Defendants Guzman, High, Popp, Faircloth, Verna,
Lukoskie, Maske, and Godev) or (2) asserted an interest in the Project
superior to BB Syndication based on their deposits but failed to allege
any affirmative defense or other legal basis for those claims
(Defendants Maung, Dhaliwal, Geathers, and McLeod).

31, 2006; IDI Acquisition Corporation on August 8, 2007;
Southeast Builder Supply on October 16, 2007; and Building
Logics, Inc. on December 5, 2007[5]. In other words, none of
the Subcontractors provided any services related to the
Project before BB Syndication's Deed of Trust was recorded
on February 21, 2006.

### III. The Current Motions

Unfortunately, the carefully crafted mechanism to sell
the Project and determine the proceeds fell apart when
Summit failed to close its purchase within the allotted
forty-five (45) day period.  In accord with the Stay Order,
a second foreclosure sale was held on December 22, 2008. BB
Syndication purchased the Project by "bidding in" a portion
of its debt.

### A. The Purchasers' Motions to Dismiss

In the wake of the aborted sale, the Sheth Defendants,
a subset of the Purchaser group, have moved to dismiss this
adversary proceeding so that they may assert their
"equitable lien" claims, if any, in state court. Due to BB
Syndication's foreclosure, the Project is no longer
bankruptcy estate property. (Sheth Motion to Dismiss, ¶ 6.)
Consequently, the Sheth Defendants believe this Bankruptcy

---

[5] A fifth subcontractor who responded to the Complaint, Schindler
Elevator Corporation, only asserted a claim of lien on funds rather
than a claim of a lien against the Project.

Court is divested of subject matter jurisdiction over the adversary proceeding. *Id.* at ¶ 6-7.

The Bertolami Defendants have joined the Sheth Motion. They point out that this adversary proceeding was intended to determine the parties' entitlement to the Project sale proceeds. Since that sale did not occur, these Purchasers see no purpose in continuing the litigation, at least in this Court.[6]   (Bertolami Resp. and Joinder to Mot. to Dismiss 2.)

BB Syndication and the Trustee disagree, for several reasons, including: (1) the prospective effect of these matters on the bankruptcy estate; (2) the need to determine the same issues, between the same parties as to the Deposit, which remains estate property; and (3) the lack of an alternative forum with subject matter jurisdiction to determine these matters.

### B.   BB Syndication's Motion for Judgment on the Pleadings

For a variety of reasons, BB Syndication's Motion for Judgment on the Pleadings asserts that no other party, neither the Plaintiff Trustee nor the other Defendants, holds an interest in the Project superior to BB Syndication's Deed of Trust recorded on February 21, 2006.

---

[6] All of the responding Defendants appear to anticipate filing actions in state court against BB Syndication to assert their alleged in rem claims.

The responding Defendants think otherwise. The Purchasers (including the Sheth and Bertolami Defendants), by virtue of their deposits, maintain that they are entitled to state law equitable liens against the Project with priority over BB Syndication's Deed of Trust. The alleged Subcontractors (Miles, McClure, and Cline) assert statutory liens against the Project that they argue prime BB Syndication's Deed of Trust under North Carolina lien law. Finally, the Trustee, under his 11 U.S.C. §544(a)(3) strong-arm powers, maintains that to the extent that the Purchasers hold recognizable equitable liens, he may avoid the same and preserve the priority for unsecured creditors.

The Trustee also claims that the forfeited Earnest Money Deposit/liquidated damages from the failed sale to Summit are property of the estate.

## IV.  DISCUSSION

### A.   Motion to Dismiss

1. <u>Movants' Theory of Divestiture</u>.

The Sheth Defendants maintain that with the Project removed by foreclosure from the bankruptcy estate, the various lien and priority issues are now immaterial. (Sheth Obj. to Mot. for J. on the Pleadings ¶ 6) (citing *In re* Sugarloaf Props, Inc. 286 B.R. 705 (Bankr. E.D. Ark. 2002)). Hence, they maintain the foreclosure sale divested

12

this Court of subject matter jurisdiction over this adversary proceeding. *Id.* at ¶ 7.

The Sheth Defendants seek support for their theory in a Seventh Circuit case, *In re* Edwards, 962 F.2d 641, 643 (7th Cir. 1992). Edwards, a Chapter 13 debtor, owed Stillman Valley National Bank some $78,000 secured by a first mortgage on Edward's real property. *Id.* at 642. Golden Guernsey Dairy Co-Op had a second mortgage on the property and was owed about $19,000. *Id.*

Edwards obtained court approval to sell his property to Noble, free and clear of liens, for $85,000. *Id.* The sale closed, and Noble's deed and a mortgage in favor of his lender, Northwest Bank, were recorded. *Id.* The sale proceeds were disbursed, paying the first mortgage holder, Stillman, in full and a partial $3,000 disbursement to Guernsey on its second mortgage claim. *Id.*

Guernsey then moved to vacate the sale, arguing that it did not receive prior notice. *Id.* at 643. Guernsey also filed an adversary proceeding against Edwards and Noble seeking a ruling that its second mortgage still enjoyed priority over the other liens against the property. *Id.* The bankruptcy court dismissed both Guernsey's motion to vacate and its adversary proceeding. *Id.* The district court affirmed. *Id.* The 7th Circuit upheld the lower courts

stating, "[s]ince the property was no longer part of the bankrupt estate and since a determination of rights to it would not affect any dispute by creditors over property that was part of the bankrupt estate, the bankruptcy court had no jurisdiction to determine rights to the property." *Id.*

Analogizing *Edwards* to the present situation, the Sheth Defendants believe dismissal of our action is required. (Sheth Obj. to Mot. for J. on the Pleadings ¶ 8) (citing *In re* Bill Cullen Electrical Contracting Co., 160 B.R. 581 (Bankr. N.D. Ill. 1993)).

The Bertolami Defendants augment the argument by quoting from a base case Order entered between the sale hearings and the purchaser's default. That Order, dated December 18, 2008, denied the Sheth Defendants' Motion for Reconsideration of the Stay Order. The December 18th Order contains a statement by the undersigned that this "adversary proceeding and its lien priority determination are only necessary if a sale actually occurs and if there are proceeds to be disbursed." Since no sale occurred, the Bertolami Defendants maintain there is no purpose to this adversary proceeding.

2. <u>Movants' Theory is Flawed.</u>

The Movants' theory is erroneous in at least three respects: a) Once obtained, bankruptcy subject matter jurisdiction is not lost by removal of the asset from the estate; b) even if this were not so, this Court has indisputable subject matter jurisdiction over the Deposit, another estate asset ignored by the Movants, and over other core bankruptcy issues implicated in this adversary proceeding; and c) there is a close nexus between the Project and these other bankruptcy assets/matters, such that bankruptcy subject matter jurisdiction continues to exist over this proceeding under "related to" jurisdiction and/or principles of supplemental jurisdiction.

> *a)   Once Obtained, Bankruptcy Subject Matter Jurisdiction is Not Lost By Removal of the Asset from the Estate.*

1.   <u>Bankruptcy Jurisdiction, Generally.</u>

Section 1334 of the Code conveys upon the U.S. District Courts subject matter jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." *See* 28 U.S.C. §1334(b). That jurisdiction is in turn exercised by the bankruptcy court, subunits of the U.S. district courts, pursuant to reference orders. *See* (Administrative Order Assigning and Allocating All Bankruptcy Matters for Administration and

Otherwise Handling and Supervision to Judge Hodges, Judge Whitley and Judge Wooten dated May 31, 1995.)

Bankruptcy matters are subdivided between "core proceedings," matters integral to the bankruptcy case, as enumerated at 28 U.S.C. §157(b)(2); and those matters that are simply "related to" a bankruptcy case. 28 U.S.C. §157(c)(1). Most courts, including those in this circuit, define "related to" to mean those matters that might have some conceivable effect on the estate. *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 836 (4th Cir. 2007)(citing *Pacor v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984)).

    2.   <u>Jurisdiction Existed in This Court When the Adversary Proceeding was Commenced.</u>

No one denies that at its inception, this adversary proceeding fell within the subject matter jurisdiction of this bankruptcy court. The Project, the focus of the sale proceeding and the genesis of this adversary, was bankruptcy estate property under §541. This Court had exclusive jurisdiction over the same. *See* 28 U.S.C. §1334(e). The responding parties asserted claims against the Debtor and/or in rem interests, legal or equitable, recognized or alleged, in the Project. Thus, the

determination of their respective rights was a core matter. *See* 28 U.S.C. §157(b)(2)(A, B, K & O).

Further, the Project was to be sold under §363, free and clear of liens and interests, with the disputes over the nature and extent of the parties' same to be determined in this adversary. Again this was a core bankruptcy proceeding under 28 U.S.C. §157(b)(2)(B, K, M, N & O).

Finally, the Trustee realized that if the Purchasers succeeded in "priming BB Syndications with their alleged equitable liens he, in turn, could likely avoid their equitable liens under his "strong arm" powers. His Complaint includes a §544 strong-arm action, another "core" proceeding. *Id*.

The need for a prompt resolution of these disputes in a single forum was also clear. Other than BB Syndication's mortgage claim, the other parties' alleged priming interests/liens in the Project were basically "long shots."[7]   However, the pendency of these claims created a cloud on the title of the Project, at least in a business sense. No rational lender or buyer would invest further monies in the Project while these claims were pending. If the Project was to be completed, some tribunal must first sort out the various claims, in rem liens or

---

[7] See discussion to the Motion for Judgment on the Pleadings, *infra*.

interests, and their respective priorities. This adversary proceeding was the vehicle to accomplish these goals. *See* Federal Rule of Bankruptcy Procedure 7001.

Unfortunately, the proposed sale to Summit has crumbled. Now, having by this condensed process enjoyed the opportunity to seek a sale, and apparently considering their chances of success to be better in piece meal state court litigation against BB Syndication[8], the two of the Purchaser groups seek dismissal.

> 3. <u>Where Subject Matter Jurisdiction Exists at the Time an Adversary Proceeding is Filed, Subsequent Events Do Not Divest the Bankruptcy Court of Jurisdiction.</u>

The Purchasers' divestiture of subject matter jurisdiction argument is also flawed. As a practical matter, the sale of an asset usually ends bankruptcy court involvement in that property. However, the Movants' premise as to why is not an accurate statement of the law.

Rather, the general rule is that where a court has bankruptcy subject matter jurisdiction (under 28 U.S.C. § 1334) at the outset of an adversary proceeding, that jurisdiction is not divested by subsequent events, such as

---

[8] During the sale hearings, Purchasers had been unable to locate controlling law that would support their priming equitable lien. In the Sale Order, this Court expressed its doubt that the Purchasers were entitled to "equitable liens" under North Carolina law or if so, that these interests would prime BB Syndications' Deed of Trust. (Order Denying Mot. for Reconsideration, Case No. 08-31710, Docket No. 97.)

a sale, and as exemplified by the case of *Owens-Illinois, Inc. v, Rapid American Corp.* (*In re* Celotex Corp.), 124 F.3d 619, 626 (4th Cir. 1997) (citing *Freeport-McMoRan, Inc. v. K N Energy. Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 859, 112 L.Ed.2d 951 (1991)).

*Owens-Illinois* involved a financial shake out of liabilities between several corporations relating to the sale of their asbestos-containing products. These companies, including Owens, Celotex, and Carey had been held jointly and severally liable to the purchasers. *Id.* at 622.

Owens paid its share of the judgments and that of Celotex. *Id.* When Celotex filed bankruptcy, Owens filed a claim for contribution. *Id.* at 623. It also sued another successor entity, Rapid American Corporation, in state court seeking contribution. *Id.* Rapid removed the matter to U.S. district court, arguing that the state contribution action was "related to" Celotex's bankruptcy case. *Id.*

Owens sought remand on several grounds, including lack of personal and subject matter jurisdiction. The latter argument was based on Owens' contention that the state action was not "related to" the Celotex bankruptcy case. *Id.* Additionally, in bankruptcy court, Rapid objected to the treatment of its claims under the debtor's confirmed

plan, and then appealed the order overruling its objection. *Id.* at 624. Meanwhile, Rapid and Celotex reached a global settlement of their disputes by transferring Rapid's disputed claim to a plan trust created to determine and pay Celotex asbestos claims.

Owens's motion for remand was denied by the district court, but Rapid's motion to dismiss was granted, for lack of personal, not subject matter, jurisdiction. In affirming the lower court rulings, the Fourth Circuit addressed the topic of whether the U.S. District Court retained subject matter jurisdiction over these matters after the "global settlement" resolved any issues affecting Celotex's bankruptcy estate.

If the adversary was not pending at the time of the settlement or plan confirmation, then each of these events may have otherwise eliminated jurisdiction under 28 U.S.C. §1334. *See id.* at 626. Since the adversary proceeding was pending at the time of plan confirmation and the settlement, the Fourth Circuit held that the district court retained subject matter jurisdiction under 28 U.S.C. § 1334 over the action. *See id.* at 624-26.

Several other circuit courts have applied the same theory, holding that even dismissal of the underlying bankruptcy case does not divest a bankruptcy court of

subject matter jurisdiction over a pending adversary proceeding. E.g., *In re* Carraher, 971 F.2d 327, 328 (9th Cir. 1992) (per curiam)(citing *In re* Morris, 950 F.2d 1531, 1534 (11th Cir. 1992); *In re* Smith*,* 866 F.2d 576, 580 (3rd Cir. 1989)).

> 4.  *Edwards is not Controlling Law in this Circuit and is Distinguishable From the Present Circumstances.*

The Movant Defendants divestiture theory relies on the *Edwards case* from the Seventh Circuit, discussed on pages 13-14. Obviously, that decision is not from our circuit and is not controlling in this case. Moreover, the two cases are distinguishable. In *Edwards*, the 7th Circuit was faced with a simple fact scenario where the entire dispute was between a couple of parties over their priority in a single asset and where the resolution could have no effect on the bankruptcy estate. *See In re* Edwards, 962 F.2d at 642-43. This is hardly the case here.

> b.  *Clear and Indisputable Bankruptcy Subject Matter Jurisdiction Lies Over Another Estate Asset and Other Core Bankruptcy Issues Treated in the Current Adversary Proceeding.*

The Movants' divestiture argument focuses exclusively on the Project and the fact that, post foreclosure, it is no longer an estate asset. This focus is not surprising. In the sale hearings, where the seeds of this action were

sown, and through the date that Summit announced it would not close, the parties and this Court were focused on the prospective sale of the Project. The Court's passing observation in the December 18, 2008 Order ("Reconsideration Order"), recited by the Bertolami Defendants reflects that focus.[9]

However, there is also the matter of the $1,000,000 Deposit posted by Summit and currently held by the Trustee. Obviously, that Deposit is currently an estate asset over which we have "core" bankruptcy jurisdiction. *See* Section 2.a.2 above.

Further, as filed, the Complaint not only seeks to determine the parties' claims against the Project, but also as against the Deposit. It asks this Court to determine the "validity, priority, and extent of any liens and interest of the Plaintiff and the Defendants in the Project **and the funds resulting from the sale of the Project**." Complaint ¶ 147 (emphasis added).

---

[9] The Bertolami Defendants make too much of the Reconsideration Order. That base case order was not intended to define either this Court's jurisdiction or the parameters of this adversary proceeding.   Having enjoyed the benefits of the Sale Order (arresting foreclosure while a consensual sale was sought), when Summit defaulted, Movants sought reconsideration of the relief from stay grant to BB Syndication. They also attempted to unilaterally set a hearing on their motion.   This would have forced our hundred plus parties into a needless hearing, and on limited notice. The Reconsideration Order was hastily drafted to avoid this result.   Anything beyond the basic ruling is of little or no precedential value.

The Deposit was posted in conjunction with the sale of the Project. Had Summit closed, this $1,000,000 would have been applied to the purchase of the building. The Deposit, therefore, constitutes funds resulting from the sale of the Project. BB Syndication in fact claims this money as proceeds of its collateral, the Project.[10] And being derived from the Project, the same claims, alleged interests and arguments pertain to the Deposit. Thus, at a minimum, this action is necessary to determine the parties' respective rights in the Deposit.

The resolution of the claims and interests dispute as to the Project affect the Deposit and, thus, the bankruptcy estate. The opposite is also true. Consequently, we have "core" subject matter jurisdiction over the matters relating to the Deposit (and any claims against the estate generally), and at a minimum, supplemental and/or "related to" jurisdiction as to those issues relating to the Project, notwithstanding the sale.

  c.  *This Court Exercises Supplemental Jurisdiction
      Over the Project Issues.*

This Court may exercise supplemental jurisdiction under 28 U.S.C. §1367(a) to hear Trustee's related Project claims. 28 U.S.C. §1667 codified the principles of

---

[10] We will put aside for a later time, the Trustee's characterization of these monies as "liquidated damages of the Trustee" (Sale Order 11) and whether they are excluded from BB Syndications' collateral.

23

ancillary and pendent jurisdiction.   An analysis of pendent jurisdiction reveals that it also applies in bankruptcy proceedings.

Section 1367(a) provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that *are so* related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties. 28 U.S.C. §1367(a).

Here, the Trustee's claims regarding the Project are within federal bankruptcy jurisdiction under 28 U.S.C. §1334(b)[11].

In analyzing whether pendent jurisdiction exists, first, the federal claim must be substantial. *Direct Satellite Communications v. Dechert Price & Rhoads* (In re *Direct Satellite Communications*), 91 B.R. 5, 6 (Bankr. E.D. Pa. 1988).   Here, the federal claim (Deposit claim) is a core bankruptcy proceeding over a substantial federal claim.

---

[11] 28 U.S.C. §1334(b) provides, "Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

Second, "the pendent claim must 'derive from a common nucleus of operative fact,' and must be of the sort normally triable in the same proceeding as the federal claim." *Id.* at 7. Here, the dispute over the Project involves the same operative facts as the dispute over the Deposit. The same core operative facts (BB Syndication's recordation date, the Purchasers deposit dates, and date of the materialman work) all serve to form the basis of the parties' claims to the Deposit and to the Project.

As to whether the interest disputes regarding the Project are of the sort normally triable in the same proceeding as the federal claim, although termed "liquid damages," the Deposit was part of the purchase price from the Project, and in practical effect, part of the proceeds and part of the sale. One can hardly suggest that matters relating to the real property and the Deposit would not be triable in the same proceeding.

Finally, whether a court exercises pendent jurisdiction is discretionary and effected by weighing the elements of "judicial economy, convenience, and fairness of litigants." *Id.* Here, these factors weigh in favor of this Court exercising pendent

jurisdiction. *See* Discussion A.2.e.    Therefore, the
Trustee's Project claim against the Purchasers
satisfies the required jurisdictional nexus with the
Trustee's Deposit claim and is part of the same "case
or controversy."

The last jurisdictional hurdle regarding pendent
jurisdiction is whether 28 U.S.C. §157(a) authorizes a
bankruptcy judge to hear supplemental claims under
§1367.  The Fourth Circuit has not directly spoken to
whether a bankruptcy court can exercise pendent
jurisdiction and hear non-federal claims raised in a
bankruptcy adversary proceeding; however a number of
other courts have so held. *See e.g., Marshall & Ilsley
Trust Co. v. Morton M. Lapides* (In re *Transcolor
Corp.*), 2007 WL 2916408, at *14 (Bankr. D. Md. 2007)
(listing decisions holding bankruptcy courts to have
supplemental jurisdiction.); *Heartwood 11, LLC v.
Dekalb County* (In re *Hospitality Ventures/LaVista*),
358 B.R. 462, 472 (Bankr. N.D. Ga. 2007) (stating, "in
bankruptcy litigation, courts recognize the
applicability of ancillary or pendent jurisdiction
principles to permit a bankruptcy judge to hear an
incidental claim otherwise outside "related to"
jurisdiction under §1334(b) if the claim was so

related to the primary claim for which jurisdiction existed.")

This Court agrees with the discussion in *Heartwood 11, LLC*, to the effect that "Congress enacted a bankruptcy jurisdiction system that vests broad bankruptcy jurisdiction in the district courts under §1334(b), and provides for referral of everything in it to the bankruptcy judges under §157(a)." *Heartwood 11, LLC*, 358 B.R. at 481. Referral of all bankruptcy matters to the bankruptcy judges extends to a claim lacking an independent jurisdictional basis but which has a nexus with a primary claim arising under the Bankruptcy Code within the district court's jurisdiction. *Id.* Therefore, §157 authorizes this Court to hear the Trustee's claim.

      d.    *Alternatively, this Court Has "Related To" Jurisdiction Over the Project Issues.*

Similar to the case for pendent jurisdiction, it would appear that this Court retains "related to" jurisdiction over the Project. *Pruitt v. Cherry* offers a cogent application of "related to" jurisdiction under circumstances similar to those at issue (i.e., a determination of the validity of interests in property no

longer part of the estate). *See Pruitt v. Cherry* (*In re Cherry*), 2006 WL 3690677, at *2 (Bankr. M.D.N.C. 2006).

In *Pruitt*, American General had a security interest in a condominium unit pursuant to a deed of trust. *Id.* at *1. The Debtor/Defendant Cherry and Plaintiff Pruitt were tenants in common, each holding a half interest in the condominium. Pruitt contended he was unaware of, and had not signed, American General's deed of trust. He requested a declaratory judgment to determine, among other things, the validity of that deed of trust as to his half interest in the property. *Id.* at *1-2. American General moved to dismiss the adversary proceeding claiming that the bankruptcy court lacked subject matter jurisdiction because the trustee had abandoned the condominium unit. *Id.* at *2-3.

The bankruptcy court denied the motion to dismiss, holding that it retained "related to" jurisdiction over the adversary proceeding. The outcome of that matter would affect American General's claim against the estate and the amounts distributed to other creditors in the bankruptcy case. *See id.* For example, if the deed of trust were removed from Pruitt's half interest, the value of the remaining interest in the condominium unit would be less than the amount of the secured debt, making American

General a general unsecured creditor to this extent. *Id.* If
so, the amount of general unsecured claims against the
estate would increase and the pro rata amount to which each
general unsecured claimant would be entitled would
decrease. *See id.* Because the adversary proceeding affected
the distribution of estate assets, the adversary proceeding
was related to the bankruptcy estate.  The bankruptcy court
retained subject matter jurisdiction despite the trustee's
abandonment of the condominium unit. *Id.*

Similarly, the outcome of this adversary proceeding
will affect the administration of this bankruptcy estate
and the order and manner in which that estate will be
distributed.  Determination of the validity and priority of
interests in the Project is necessary to determine the
which parties will receive distribution and the order in
which the Deposit will be distributed by the Trustee.
Therefore, this Court has, at worst, "related to"
jurisdiction pursuant to §157(a).

> e. *Potential Adverse Effects are Likely if the*
> *Project Issues are Severed from the Deposit*
> *Issues and Asserting in Different Forums.*

The reasons why the Project Issues are pendent or
"related to" this Bankruptcy case become clear if one
indulges in a "what if" game.  Because the Deposit is
estate property, all issues pertaining to it must stay in

this Court. So too, the parties' various claims against the bankruptcy estate. Clearly, a substantial portion of the matters raised in the adversary proceeding will have to be resolved in bankruptcy court.

If we do as the Purchasers suggest by dismissing the Project issues, piece meal litigation will be the result. At best, the same parties would be arguing the same theories based on the same facts, but in two different courts, one state, one federal. This fact alone creates the opportunity for inconsistent results.  What if the state court recognizes priming equitable lien claims, but this Court does not?  What if a lien claim is elevated in one forum but subordinated (and is placed "out of the money") in another forum?  How do we reconcile the discordant rulings as to the two assets?

Frankly, the matter may be much messier than that. The moving parties who seek to return to state court to file their suits do not represent all of the Purchasers. While these parties are likely to sue BB Syndication, they are quite unlikely to name all of the other purchasers to their action, much less all of the lien claimants. Now we have the prospect of some similarly situated parties obtaining relief on their claims, while others get none.

The prospect for inconsistent treatment expands exponentially, if there are multiple suits filed, either by differing groups of Purchasers or by individual lien claimants.

Meanwhile as reward for having held up its foreclosure and consented to this bankruptcy proceeding, BB Syndications will be forced to defend multiple actions in different courts.

Adding another level of complexity, under the principles of collateral estoppel, a ruling on the Project in one state court action brought by a limited number of Purchasers would arguably be preclusive in this Court, as against BB Syndication. However, other Purchasers' rights versus the lender would not have been determined in state court. How do we treat them in this proceeding? Finally, any state court determinations may be binding on BB Syndication and on some of the Purchasers. They would not be preclusive as to the Bankruptcy Trustee or to unnamed lien holders. A Rubik's Cube of possible conflicting outcomes could result.

Even if a superseding event occurs during a bankruptcy case that might suggest returning the proceeding to State court, before doing so, a bankruptcy court is obliged to consider the consequences of that action, in terms of

economy, convenience, fairness, and comity. *See Carraher v. Morgan Electronics* (*In re* Carraher), 971 F.2d 327, 328 (9th Cir. 1992). In *Carraher*, the court assessed a bankruptcy court's discretion in determining whether to retain a related case after dismissal of the underlying bankruptcy case. *Carraher*, 971 F.2d at 328. The *Carraher* court looked to the authority of federal district courts to retain pendent state claims after the federal claims have been dismissed. Relying on the Supreme Court holding in *Carnegie-Mellon Univ. v. Cohill*[12], *Carraher* holds that courts must consider economy, convenience, fairness, and comity. *Id.*

The factors outlined in *Carraher* all lead to the conclusion that this bankruptcy court should retain jurisdiction over the adversary, including the Project claims. First, there is no reason to think this bankruptcy court would be less efficient than the state court(s) in determining the rights of these potential in rem interests. Given that this Court is already familiar with the complex factual setting, and already has fashioned with the parties a method (the present adversary proceeding) to determine their rights, efficiency weighs in favor of retaining the matter. This is especially true given that we will have to

---

[12] *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 353 (1988).

decide the same issues with the same parties relating to the Deposit. It is more efficient and economical for this Court to hear both matters.

As to fairness, BB Syndication originally foreclosed on May 27, 2008, without any party objecting to its actions. BB Syndication acquiesced to this procedure when it could have otherwise obtained relief from stay and allowed the Trustee to market the Project. It has been attempting to exercise its remedies under its loan documents for nearly a year. Meanwhile the Project sits exposed to the weather. It would be manifestly unfair to the lender to delay these matters any further by sending the Project issues back to state court when this court can resolve the same.

In sum, with more than one asset; multiple parties' claims to the same; a process that was consensually agreed to by the parties when it appeared advantageous to their interests; and given the need for a resolution of these matters in one forum, it would be improvident to dismiss any part of the adversary proceeding. Core, related to or pendent jurisdiction exists as to all claims raised in the action. The Motion to Dismiss should be Denied.

### C.   BB SYNIDICATION'S MOTION FOR JUDGMENT ON THE PLEADINGS

Under Federal Rules of Bankruptcy Procedure 7012(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed - but early enough not to delay trial." FED. R. BANKR. P. 7012(c). The test for judgment on the pleadings is "whether or not, when viewed in the light most favorable to the party against whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law." *See*, e.g., *Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 728 (E.D.N.C. 2008) (citations omitted). "When there are no genuine issues of material fact raised by the pleadings, judgment on the pleadings should be granted where the moving party is entitled to the judgment it seeks as a matter of law. *See*, e.g., *id.* (citations omitted).

### 1.   The Alleged Equitable Liens are Invalid Because the Purchase Contracts Show No Intention to Create an Equitable Lien.

Priority aside, the alleged Equitable Liens are simply not sustainable under North Carolina law. North Carolina courts have recognized equitable liens under a range of circumstances. However, as here, where an equitable lien arises from a written contract, that contract must show "an intention to charge some particular property with a debt or

34

obligation." *See Garrison v. Vermont Mills*, 154 N.C. 1, 6, 69 S.E. 743, 744-45 (N.C. 1910).

Here, the Purchasers had the opportunity to create interests that they now ask this Court to create for them but failed to do so. Neither paragraph 3(a) of the Purchase Contracts, which offers a comprehensive explanation of the deposit obligation, nor any other portion of the Purchase Contracts expresses or implies an intention to charge the Project with any deposits paid under those Purchase Contracts. Because the Purchase Contracts fail to express the intention necessary to create an Equitable Lien, those alleged Equitable Liens are invalid under North Carolina law. *See Bramham v. First Nat'l Bank*, 9 F. Supp. 979, 982 (1934) (acknowledging that, equity, no more than the law, may disregard the intention of the parties as disclosed by their final contract or previous negotiations).

Having failed to create an Equitable Lien under their Purchase Contracts, the Purchasers offer alternative arguments seeking to support their alleged Equitable Liens. None are availing. First, the Purchasers make an artificial distinction between the actual payments of the deposits and the Purchase Contracts to argue that the deposit payments, rather than the Purchase Contracts, should be the basis for their Equitable Liens. This

contrivance falls flat, because it is the Purchase
Contracts that create the payment obligations. The
contracts, therefore, are the source of any Equitable Liens
claimed by the Purchasers. Indeed, no deposits would have
been paid, and no Equitable Liens could exist, separate and
apart from the Purchase Contracts.

Second, the legal standard advanced by the Purchasers
has no application under the present circumstances. The
Purchasers base their alleged Equitable Liens on "general
considerations of right and justice, applied to the
relations of the parties and the circumstances of their
dealings." However, the Purchasers have no Equitable Liens
based on their "relations" and "dealings" with the Debtor
where they never expressed an intention to create an
Equitable Lien under the terms of their Purchase Contracts
with the Debtor.

An equitable lien arises either from (1) a written
contract which shows an intention to charge some particular
property with a debt or obligation, or (2) a declaration of
a court of equity out of the general considerations of
right and justice, as applied to the relations of the
parties and the circumstances of their dealings. *See
Garrison*, 69 S.E. at 744-45.

Where a written contract is the basis for an equitable lien, the "relations and dealings" between parties is immaterial. Otherwise, any party who had the opportunity but failed to express their lien intentions in a written contract, as the Purchasers did, could simply default to their relations and dealings, rendering the "written contract" requirements a nullity.

2.  <u>The Present Facts Do Not Justify the Creation of an Equitable Lien Under the Doctrine of Unjust Enrichment.</u>

Deposit Defendant Antoniak asserts that relief should be available under the doctrine of unjust enrichment. (Antoniak Answer 1.)  This Court disagrees. The relations and dealings described in the pleadings do not support creation of an Equitable Lien.

To support their unjust enrichment argument, the Depositor Defendants argue that equity is flexible enough to provide the remedy they request.  Unfortunately, none of the authorities they cite applies under present circumstances. Those cases concern "special factors" that justified imposition of equitable liens, such as confidential or fiduciary relations or unjust enrichment. *See Fulp v. Fulp*, 264 N.C. 20, 23, 140 S.E.2d 708, 711 (N.C. 1965) (basing equitable lien on confidential husband-wife relationship); *Guy v. Guy*, 104 N.C. App. 753, 759, 411

S.E.2d 403, 704 (N.C. Ct. App. 1991) (basing equitable lien based on son's fraudulent use of father's funds); *Biesecker v. Biesecker*, 62 N.C. App. 282, 302 S.E.2d 826, 829-30 (N.C. Ct. App. 1983) (declaring equitable lien based on unjust enrichment between spouses); *Richardson v. Carolina Bank*, 59 N.C. App. 494, 496, 297 S.E.2d 197 (N.C. Ct. App. 1982) (permitting equitable lien theory based on confidential relationship and unjust enrichment).

The relations and dealings shared by the Purchasers and the Debtor do not include any special circumstances that warrant the decree of an equitable lien. At best, those relations and dealings evidence breaches of contracts to convey real property between arm's length parties. *See Dalton v. Camp*, 353 N.C. 647, 652, 548 S.E.2d 704, 708 (N.C. 2001) (defining parameters of a fiduciary relationship); *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (N.C. 1988) (holding that no claim for unjust enrichment exists where an actual contract is at issue).

> 3.   The Deposit Payments were Validly Used by the Debtor.

Certain Purchasers also argue that the Debtor may have used the deposit payments in contravention of the Purchase Contracts and the North Carolina Condominium Act (the

"Condominium Act"). That position is untenable under the plain language of the Purchase Contracts and the Condominium Act. Under the terms of the Purchase Contracts, the Purchasers agreed that the Debtor could use the deposit for any purpose whatsoever following the start of construction of the condominium and the expiration of a 7-day cancellation period. *See* (Purchase Contracts, ¶ 3(a).)

The Purchasers also argue that the Debtor could not use the deposit amounts for any purpose as permitted by the Purchase Contracts because construction has not begun on the "Condominium." They interpret "Condominium" to mean the individual condominium units they purchased. The Purchase Contracts, however, separately define "Condominium" as "The Park Condominium" and "Unit" as the individual units within and the related interests in the common areas of the Condominium. *See* (Purchase Contracts, ¶ 1.) Construction of the "Condominium" was ongoing until early 2008; therefore, the conditions to the Debtor's use of the deposits were satisfied.

Furthermore, the Purchase Contracts are consistent with North Carolina General Statute §47C-4-110, which provides:

> (a) [a]ny deposit made in connection with the
> purchase . . . of a unit shall be immediately
> deposited in a trust or escrow account in an

insured bank or savings and loan association in
North Carolina and shall remain in such account
for such period of time as a purchaser is
entitled to cancel pursuant to G.S. 47C-4-108 [(7
days)] or cancellation by the purchaser
thereunder whichever occurs first. Payments held
in such trust or escrow accounts shall be deemed
to belong to the purchaser and not the seller.

(b) Except as provided in G.S. 47C-4-108, nothing
in subsection (a) is intended to preclude the
parties to a contract from providing for the use
of progress payments by the declarant during
construction. N.C. GEN. STAT. §47C-4-110.

In short, the deposit limitations and requirements

imposed by §47C-4-110 applied to the earnest money deposits

at issue only during the seven-day cancellation period.

Therefore, neither the Purchase Contracts nor the

Condominium Act offer a basis upon which to support

fraudulent use of the deposit amounts by the Debtor. In

conclusion, the Purchasers have no valid equitable liens as

against the Project based on the doctrine of unjust

enrichment.

4.   A Constructive Trust in Favor of the Deposit
     Purchasers was Not Created.

The Bertolami Defendants also assert a claim for the

creation of a constructive trust to "prevent unjust

enrichment of the holder of title, or of an interest in,

property which such holder acquired through fraud, breach

of duty, or *other circumstances making it inequitable for

him to retain such title or interest against the*

40

*beneficiary of the constructive trust.*"   (Supplemental
Resp. to BB Syndication's Mot. For Judgment on the
Pleadings 9) (citing *Wilson v. Crab Orchard Dev. Co.*, 276
N.C. 198, 211 (N.C. 1970).

As previously stated, any such misuse of funds claim
necessarily arises under the Purchase Contract or the
Condominium Act. Since the Purchase Contracts allowed for
the use of the funds on the "Condominium," and the
construction of the condominium was ongoing until early
2009, the Bertolami Defendants argument fails.

5.   The Doctrine of Equitable Estoppel is
Inapplicable.

The Bertolami Defendants also argue that the Debtor
and BB Syndication are prohibited under the doctrine of
equitable estoppel from denying the equitable liens arising
from the improper removal of the Deposit Purchasers'
deposits from escrow and use of their deposits in violation
of the Purchase Contracts and North Carolina law.
(Bertolami Answer 12.) The Court has already disposed of
the Deposit Purchasers' claim involving the alleged misuse
of the Deposit Purchasers' escrowed deposit.   Therefore,
this claim fails.

In conclusion, given the aforementioned case law and
the fact that BB Syndication was first to record its

41

interest, as a matter of law, the Deposit Purchasers have no Equitable Liens on the Project. Even if North Carolina were to recognize an Equitable Lien in the current situation, these Equitable Liens would be subordinate to BB Syndication's interest given the lack of recordation by the Deposit Purchasers. Also, at the time of foreclosure, whatever liens may have existed (i.e. Deposit Purchasers' Equitable Liens behind BB Syndication) were cut off at the foreclosure sale.

6.  <u>BB Syndication's Interest as a Matter of Law is Superior to the Interests Claimed by the Purchasers Because BB Syndication Recorded Its Deed of Trust Before the Purchasers Recorded the Purchase Contracts</u>.

BB Syndication's Motion for Judgment on the Pleadings maintains that no other parties can establish a prior interest in the Project in relation to BB Syndication's Deed of Trust. As to those Purchasers claiming an equitable lien against the Project, BB Syndication points out that no such equitable lien has ever been recognized in North Carolina; even if it were, there is no basis upon which that interest would be of superior priority to BB Syndication's lien under the Deed of Trust. The Purchasers have no basis upon which to claim that BB Syndication was unjustly enriched at their expense or that they are otherwise equitably entitled to an interest in the Project

superior to BB Syndication. The remaining Purchasers failed to plead any colorable legal theory to justify the relief requested.

BB asserts that no party has established a valid interest in the Project superior to its own, for several reasons:

**(1)   Purchasers   (including   the   Sheth   and   Bertolami Defendants)**

BB Syndication's interest in the Project is superior to the Purchasers' alleged equitable interests, because those interests arise, if at all, from contracts to convey real property, which the Purchasers acknowledge they failed to record prior to BB Syndication's Deed of Trust.

**(2) Rita Rochelle Miles & Miles Interior Design, Inc**

Defendant Miles has no valid lien against the Project, because although she alleges that she provided design services related to the Project, she is not a validly-registered architect, engineer, land surveyor or landscape architect.

**(3)   The Subcontractors: McClure and Cline**

BB Syndication's interest in the Project is superior to any interests claimed by these Subcontractors because, by their own admission, none of the Subcontractors provided

labor or materials to the Project before BB Syndication's Deed of Trust was recorded.

### (4) The Trustee

Since neither the Purchasers, nor Miles, nor the Subcontractors have equitable liens, the Trustee has no such equitable liens to avoid pursuant to §544.

BB Syndication's arguments are well taken. Under North Carolina General Statute §47-18 and §47-20 ("Recording Acts"), priority among competing interests in real property arising from contracts to convey or deeds of trust is determined according to the order in which those instruments are recorded. *See* N.C. Gen. Stat. § 47-18 (providing that no contract to convey real property "shall be valid to pass any property interest as against lien creditors . . . but from the time of registration thereof in the county where the land lies . . ."); *Id.* at § 47-20 (concerning recordation and priority of deeds of trust); *Stephenson v. Jones*, 69 N.C. App. 116, 123, 316 S.E.2d 626, 631 (N.C. Ct. App. 1984).

This method of determining priority, which has been described as "pure-race," means that priority is determined according to who wins "the race to the courthouse." It is a method that has prevailed in North Carolina for well over a century.

The Recording Acts are intended to eliminate all secret liens, trusts and unregistered interests and to allow potential purchasers and creditors to rely completely on the public record to safely determine the title being obtained. *See*, e.g., *Schuman v. Roger Baker & Assocs.*, 70 N.C. App. 313, 316-17, 319 S.E.2d 308, 311 (N.C. Ct. App. 1984). Accordingly, record notice is the only notice sufficient to establish priority under the Recording Acts. Actual notice of such interests apart from recordation, no matter how full and formal, is irrelevant. *See Stephenson*, 69 N.C. App. at 124-25; *Schuman*, 70 N.C. at 316 (noting that the North Carolina Supreme Court "has repeatedly held that no notice, however full or formal, will supply the want of registration").

Here, the competing interests claimed in the Project by BB Syndication and the Purchasers are subject to the Recording Acts. First, BB Syndication's interest is based on the Deed of Trust. Second, the equitable liens against the Project claimed by the Purchasers ("Equitable Liens"), if they exist at all, arise from the Purchase Contracts. Indeed, the Purchasers have no connection to the Project other than through the Purchase Contracts, and those Contracts create and define the deposit payment obligations to which the Equitable Liens correspond. Accordingly, any

45

alleged Equitable Lien resulting from the fulfillment of those payment obligations necessarily arises from the Purchase Contracts. Because the Purchasers' and BB Syndication's alleged interests in the Project arise, respectively, from the Purchase Contracts and the Deed of Trust, the priority of those interests is determined under the Recording Acts based on the order in which those interests were recorded.

North Carolina courts have consistently applied the mandate of the Recording Acts when confronted with competing interests like those at issue. For example, in *Wood v. Tinsley*, the North Carolina Supreme Court confirmed the priority of the Woods' interest in real property under a recorded deed over the Tinsley's interest under an earlier, but unrecorded, contract to convey. *See Wood v. Tinsley*, 138 N.C. 507, 515, 51 S.E. 59, 62 (N.C. 1905). Tinsley had paid a previous owner, Lankford, for the property pursuant to an oral contract to convey and had made several improvements to the property. *Id.* at 59. When the Woods sued Tinsley for wrongful possession, Tinsley claimed he was entitled to possession of the property until the Woods paid him the amounts he expended to purchase and improve the property. *Id.* at 59-60. He argued that the

Woods had actual notice of those payments and improvements
before recording their own interests. *Id*.

The court rejected Tinsley's claim of priority. *Id.* at
62. Contracts to convey were on the same footing as deeds
of trust under the Recording Acts. Since 1829, consistent
North Carolina precedent has recognized recordation as the
sole means of establishing priority among the competing
interests claimed by the parties. *See id*. at 60 (stating
that the unrecorded contract to convey would be ineffective
against third parties even if the contract had been written
and the defendant paid the entire purchase price).

According to the court, while a person typically takes
property subject to those equities of which he has notice,
equity must follow the law. *See id*. at 61. North Carolina
law expressly declares that interests under an unrecorded
contract to convey are void against third parties. *See id*.
Therefore, regardless of the Woods notice of any equities
based on Tinsley's contract to convey, Tinsley's failure to
record that contract in accordance with the Recording Acts
defeated any claim of priority. *See id*. (holding that "in
obedience to a well-defined and settled public policy,
which finds expression in clear and explicit language in
the statute," the plaintiffs did not take the Project
subject to any equity of the defendant under an unrecorded

contract to convey despite actual knowledge of such equities).

The North Carolina Supreme Court reaffirmed the *Wood* holding in *Grimes v. Guion*. *See Grimes v. Guion*, 220 N.C. 676, 676, 18 S.E.2d 170, 173 (N.C. 1942). Plaintiff *Grimes*, like *Wood*, owned certain real property pursuant to recorded deeds. Grimes sued Guion, who maintained possession of the property pursuant to an unrecorded contract to convey. *Grimes*, 18 S.E.2d at 172-73. Guion argued that Grimes had actual notice of her interest and demanded repayment of the purchase price before relinquishing possession. *See id.*

The court rejected Guion's argument. Any equities arising from an unrecorded contract to convey could not defeat the priority of Grime's interest under the recorded deeds. *See id.* at 172. The court noted that Guion had no contract with Grimes and could only attack the priority of Grimes' interest based on Grimes' actual notice of (1) Guion's contract with another party and (2) the equities against that party with whom Guion had contracted. *See id.*

Although Guion was the victim of a "grievous wrong" under her contract, Grimes did not cause that wrong. Rather, he merely complied with the Recording Acts to protect his own interests. *See id.* at 173. On that basis,

48

the court affirmed the priority of Grimes' interest in the property. *See id*.

The decisions in Wood and Grimes stand in stark contrast to the outcome of *S.C. Fed. Sav. Bank v. San-A-Bel*[13], a South Carolina Court of Appeals case relied upon by the Depositor Defendants. In *San-A-Bel*, the South Carolina Court of Appeals noted that "[o]rdinarily, one who takes a security interest in real property with notice of an existing third party equity in the property takes subject to the third party's interest[.]" *See San-A-Bel*, 307 S.C. at 79. The *San-A-Bel* court granted the priority of an equitable lien based on such notice.

The South Carolina holding in *San-A-Bel* is substantively opposite result from the North Carolina's Supreme Court's holding in *Wood* and *Grimes*. However, there is a rational basis for the differing rulings. South Carolina is a race-notice jurisdiction that determines priority based on recordation or actual notice. North Carolina, in contrast, is a pure race state, where notice is irrelevant. In a pure race state the sole determinative is which party recorded first.

---

[13] *S.C. Fed. Sav. Bank v. San-A-Bel*, 307 S.C. 76, 413 S.E.2d 852 (S.C. Ct. App. 1992)

Those jurisdictions that have affirmed the priority of equitable lien claims based on actual notice by the recording party consistently have done so in reliance on race-notice recording statutes, not race statutes. *See Cox v. RKA Corp.*, 164 N.J. 487, 494-01, 753 A.2d 1112, 1117-20 (N.J. 2000) (relying on New Jersey race-notice recording statutes to determine priority of equitable lien); *Tile House, Inc. v. Cumberland Fed. Sav. Bank*, 942 S.W.2d 904, 905-06 (KY 1997) (relying on Kentucky race-notice recording statute to grant priority of home purchaser's equitable lien based on deposit paid pursuant to contract to convey against bank's interest based on bank's actual notice but denying priority against other lienholders based on lienholders lack of notice and home purchaser's failure to record contracts).

Since North Carolina is a race state, not a race-notice state, neither *San-A-Bel* nor these other cited decisions offer substantive parallels to our case. No court in a pure race statute state has ever held an equitable lien, in a situation akin to the present matter, primes a bank's recorded security interest.

Although the substantive outcomes from these race-notice jurisdictions are inconsistent with North Carolina's pure-race approach, *San-A-Bel* and other cited decisions are

50

entirely consistent with the prevailing maxim relied upon in *Wood* that "equity follows the law." Reliance on the governing jurisdictional recording statutes supports the application of the Recording Acts under North Carolina law.

Finally, it should be noted that equitable liens are disfavored in bankruptcy, as they upset the priority scheme. *See Kunkel v. Ries* (*In re* Morken), 199 B.R. 940, 965 (Bankr. D. Minn. 1996) (citing *U.S. v. Noland*, 517 U.S. 535 (1996) (stating that a "bankruptcy court may not equitably subordinate claims on a categorical basis in derogation of Congress's scheme of priorities).

Even if the alleged Equitable Liens were valid, these alleged interests would be subordinate in priority to BB Syndication's lien under the Recording Acts, and, therefore, cut off BB Syndication's foreclosure. This is because the Deed of Trust was recorded prior to any Purchase Contracts. Like the defendants in *Wood* and *Grimes*, the Depositor Defendants' alleged interests arise from contracts to convey, which they admit they did not record prior to BB Syndication's Deed of Trust.

Finally, as to the Purchasers' contentions that they were victims of a wrong, this may or may not be true depending on why the Project was not completed. However, it is clear that under their respective Purchase Contracts,

BB Syndication did not cause those wrongs. This is especially true since BB Syndication extended a $30 million line of credit to the Debtor for construction of the Project and properly preserved its lien by recording the Deed of Trust without any record notice of the Purchasers' claims against the Project. Accordingly, BB should not bear any negative equities related to those Purchase Contracts. Therefore:

(1)   BB Syndication has a valid, perfected lien on the Project pursuant to its Deed of Trust; and

(2)   BB Syndication's lien pursuant to its Deed of Trust is superior to any other lien on the Project and dismisses with prejudice the claims of the Deposit Purchasers.

7.   The Alleged Equitable Liens are Invalid as Against the Earnest Money Deposit.

Turning to the Deposit, the same principles that applied to the Project also apply to the Earnest Money Deposit, which may be proceeds of BB Syndication's collateral pursuant to 11 U.S.C. §552(b). It is clear that any priming Equitable Lien by the Deposit Purchasers[14] would not apply to the Deposit and would fail as well.

---

[14] The Court is unaware of any theory by which the prospective lien creditors would have interests in the Deposit.

Second, the earnest money deposit is a post-petition asset. The automatic stay of 11 U.S.C. §362(a)(4) would protect the assertion of any such pre-petition equitable claims against this post-petition asset. If the Purchasers have no valid equitable lien claim to the Project, a pre-petition asset, then the Deposit Purchasers certainly have no valid equitable lien claim to the earnest money deposit. Therefore, the Court dismisses with prejudice any claims of interest by the Deposit Purchasers with respect to the Earnest Money Deposit. This asset is either BB Syndication's collateral or else unencumbered asset of the bankruptcy estate.

8. <u>The Trustee's §544 Claim is Dependent on the Success of the Deposit Purchasers and, Accordingly, Fails.</u>

The Trustee's §544 claims to the Project are dependent on the success of the Deposit Purchaser's Equitable Liens theories. Since the Deposit Purchasers have no Equitable Liens on the Project and Deposit, there are no Equitable Liens for the Trustee to avoid and preserve. Since the Trustee has no Equitable Liens to preserve, the Trustee also has no viable claim to the Project.

By contrast, the issue of whether the Deposit qualifies as "liquidated damages," to the estate or

additional proceeds collateral of BB Syndication remains to be determined in this adversary proceeding. Therefore,

(1)   The Trustee's avoidance claim on the Project is Dismissed with prejudice;

(2)   The Trustee's and BB Syndication's claim on the Deposit shall be preserved for later determination. No other party has an interest in the Project.

9.   <u>Defendant Miles Has No Valid Lien Rights Under North Carolina Because She is Not a Licensed Architect, Engineer, Land Surveyor and Landscape Architect Registered Under North Carolina Law</u>.

Defendant Miles, an interior designer, maintains that she provided certain design consulting services related to the Project, including: (1) effected and altered the design of the condominium project when the Depositors requested that she move walls or create bathrooms, closets and rooms where none existed under the original architectural plans; (2) created room renderings for submission to the architect; (3) selected cladding, fixtures and signage; (4) designed the putting green; rooftop garden and elevator lobbies; and (5) furnished material samples for the design sales center.

To have a valid claim of lien against the Project, Miles must have improved the Project within the meaning of

Chapter 44A of the North Carolina General Statutes. *See*
N.C. GEN. STAT. §44A-7 (defining "real property" as "the real
estate that is improved, including lands, leaseholds,
tenements and hereditaments, and improvements placed
thereon"); §44A-8 (stating that lien claimant must provide
services "pursuant to a contract, either express or
implied, with the owner of real property for the making of
an improvement thereon"). Section 44A-7(1) defines
"improve" to mean:

> to build, effect, alter, repair, or demolish any
> improvement upon, connected with, or on or
> beneath the surface of any real property, or to
> excavate, clear, grade, fill or landscape any
> real property, or to construct driveways and
> private roadways, or to furnish materials,
> including trees and shrubbery, for any of such
> purposes, or to perform any labor upon such
> improvements, or design or other professional or
> skilled services furnished by architects,
> engineers, land surveyors and landscape
> architects registered under Chapter 83A, 89A or
> 89C of the General Statutes. *See* N.C. GEN. STAT.
> §44A-7(1).

The services Miles sets forth in her Answer fail to
support a claim of lien against the Project. First, the
mere furnishing of material samples for the sales center
does not qualify as an improvement of the Project. The
North Carolina Court of Appeals has addressed whether a
lien claimant who indirectly impacts real property has a

valid lien.  *See Southeastern Steel Erectors, Inc. v. Inco, Inc.*, 108 N.C. App. 429, 434 (N.C. Ct. App. 1993).

In *Southeastern Steel Erectors*, the court assessed the lien claim by a second tier subcontractor that provided rental equipment to a job site. *Id.* at 430.  It was apparent to the court that "labor" and "improve" contemplated "actual work done by the person claiming a lien... which *directly* impacted on the real property in question. Providing rental equipment is an *indirect* means of aiding in the improvement of real property." *Id.* at 434.  Therefore, the court concluded that supplying rental equipment did not constitute furnishing labor.

Here, Miles' contention that she furnished material samples for the sales center is analogous to the contentions made in *Southeastern Steel Erectors*.  The samples provided by Miles only indirectly impacted the Project by allowing customers to see their available choices rather than being used directly to build the Project.  Therefore, Miles claim for materials furnished fails.

The remaining services Miles allegedly provided are design related and may support a lien only if furnished by a validly registered architect, engineer, land surveyor or landscape architect. *See* N.C. Gen. Stat. § 44A-7(1) (defining

"improve"). Miles does not allege she is a registered professional listed under N.C. GEN. STAT. §44A-7(1). Thus, she has no lien rights related to any design services she alleges she provided.

Finally, Miles cannot avoid the professional registration requirements and avail herself of a claim of lien for design services by characterizing those services as "altering or effecting" the design of the condominium units or "labor in the design of the Park Condominium project." *See* (Defendant Miles Answer, ¶ 185).  Labor, altering, or effecting in the course of design services, without more, remain design services and must be performed by a registered professional to support a valid lien. Otherwise, the professional registration requirement would be meaningless if unlicensed professionals could claim lien rights by simply re-characterizing the design services they provided as "labor." *See Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (N.C. 1998) (stating that a court must evaluate a statute as a whole and not construe an individual section in a manner that renders another provision of the same statute meaningless); *State v. Coffey*, 336 N.C. 412, 417, 444 S.E.2d 431, 434 (N.C. 1994) (holding a statute should not be interpreted in a manner which would render any of its words superfluous).

Therefore, Defendant Miles's claim to a lien is DENIED and dismissed with prejudice.

10. <u>None of the Subcontractors Provided Services to the Project Before the Deed of Trust was Recorded; Therefore, Any Liens Based on Those Services are Junior to BB Syndication's Interest in the Project.</u>

BB Syndication's Deed of Trust interest is superior to the Defendant Subcontractors. The Subcontractor Defendants did not and cannot demonstrate an interest in the Project superior to BB Syndication's interest under its Deed of Trust.  If the Subcontractors had a valid lien, those lien claims only relate back to the respective times that each Subcontractor first furnished of labor or materials at the site of the improvements. *See* N.C. GEN. STAT §44A-10 (stating a lien claim on real property shall relate to and take effect from the time of the first furnishing of labor or materials at the site of the improvement by the person claiming the claim of lien on real property.)

Turning to the furnishing date, each Subcontractor first furnishing of labor on the following dates:

(1)  C.P. Buckner Steel Erection, Inc. - July 31, 2006

(2)  IDI Acquisition Corporation - August 8, 2007

(3)  Southeast Builder Supply - October 16, 2007

(4)  Building Logics, Inc. - December 5, 2007

Case 08-03151   Doc 125   Filed 06/17/09   Entered 06/17/09 16:53:23   Desc Main
Document   Page 59 of 60

Because all of the Subcontractors admit that they first provided services or materials after the recordation of BB Syndication's Deed of Trust on February 21, 2006, none of those lien claims, even if valid, are superior to BB Syndication's interest. *See Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd.*, 294 N.C. 661, 667, 242 S.E.2d 785, 789 (N.C. 1978) (stating that a "contractor's lien for all labor and materials furnished pursuant to a contract is deemed prior only to those liens or encumbrances attaching to the property subsequent to the date of the contractor's first furnishing of labor or materials to the construction site).

Additionally, Schindler Elevator Corporation asserted a claim of lien on the Deposit. Given that Schindler does not have a superior lien on the Property, Schindler consequently does not have a superior lien on the Deposit. Therefore, the Subcontractor claims are DENIED and dismissed with prejudice.

**V.   CONCLUSION**

For the foregoing reasons and pursuant to the law cited herein,

(1) Purchasers' Motion to Dismiss is **DENIED;**

(2) BB Syndication's Motion for Judgment on the Pleadings is **GRANTED** in part and **DENIED** in part;

59

(3)   BB Syndication's lien under the Deed of Trust is superior as a matter of Law to the lien claimants' claims against the Project;

(4)   As a matter of law, neither the Purchasers nor the lien claimants have any in rem interests to the Deposit;

(5)   The Purchasers' and lien claimants' Project and Deposit in rem interest claims are **DENIED** and **DISMISSED WITH PREJUDICE;**

(6)   The amounts of claims by the Purchasers and lien claimants will be preserved in the base bankruptcy case in the claims process; and

(7)   The Trustee's and BB Syndication's claim as to the Deposit will move forward in this adversary proceeding.

**SO ORDERED**

**This Order has been signed                          United States Bankruptcy Court**
**electronically.  The judge's**
**signature and court's seal**
**appear at the top of the Order.**